```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                       :
ALEX PALACIOS,                                         :
                                                       :
                                  Plaintiff,           :
                                                       :
               -v-                                     :
                                                       :
THE CITY OF NEW YORK, POLICE OFFICER                   :
MICHAEL GREANEY, Shield #20646, POLICE                 :
OFFICER FRANK MONGE, Shield #27984, DET. JOSE          :
CHEVERE, Shield #1505, POLICE OFFICERS                 :
JOHN/JANE DOE(S) # 1–10,                               :
                                                       :
                                  Defendants.          :
                                                       :
------------------------------------------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _9-11-17_

15 Civ. 386 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This decision resolves cross-motions for summary judgment in this case involving claims

of false arrest and excessive pre-arraignment detention.  These arise from the approximately 41-

hour detention, between arrest and release, of plaintiff Alex Palacios on May 22 and 23, 2014.

Palacios claims his arrest was unsupported by probable cause and that his detention was illegally

lengthy because neither of the grounds articulated for detaining him ultimately stuck.  Palacios

was arrested based on the fact that the victim of an attempted robbery in 2012 had then

photographically identified Palacios as her attacker, but upon his arrest two years later, the

victim asked prosecutors to drop the case, stating that she could no longer confidently identify

her assailant.  Thereafter Palacios was held based on an entry in the New York City Police

Department's ("NYPD") Automated Database for Warrants ("ADW") which reported an active

arrest warrant for Palacios dating to 2011, but it later emerged that that warrant had been vacated

shortly after it had been entered.  Based on these events, Palacios brings claims under 42 U.S.C.

§ 1983 and under state law against the City of New York (the "City"), Police Officers Michael

Greaney and Frank Monge, and Detective Jose Chevere.[1]

Defendants now move for summary judgment on all federal claims and ask the Court to

decline to exercise supplemental jurisdiction over Palacios's state-law claims.  Palacios, in turn,

seeks summary judgment on his claims.

For the reasons that follow, the Court grants defendants' motion and denies Palacios's

motion.

## I.    Background

### A.    Factual Background[2]

#### 1.    The 2011 Summons and Subsequent Warrant

On May 5, 2011, Palacios was issued a summons in the Bronx for an administrative code

violation of being "in park after dusk."  JSF ¶¶ 1; Zelman Decl., Ex. N.  The summons required

Palacios to appear in Bronx County Criminal Court on July 12, 2011.  JSF ¶ 2.  Palacios never

appeared, prompting the Bronx County Criminal Court to issue a warrant for his arrest.  *Id.* ¶ 3.

---

[1] The Amended Complaint ("AC") also names as defendants "Police Officers John/Jane Doe(s) # 1–10."  Dkt. 34.  The Court *sua sponte* dismisses the claims against the Doe defendants, without prejudice, because discovery has closed and Palacios has not identified or served them.  When a plaintiff "has had ample time to identify a John Doe defendant but gives no indication that he has made any effort to discovery the defendant's name . . . the plaintiff simply cannot continue to maintain a suit against the John Doe defendant."  *E.g., Coward v. Town and Village of Harrison*, 665 F. Supp. 2d 281, 300 (S.D.N.Y. 2009) (quotation and alterations omitted).

[2] The Court draws its account of the underlying facts from the parties' respective submissions on the motions for summary judgment, including the Joint Stipulation of Facts, Dkt. 72 ("JSF"); each party's Statement Pursuant to Local Civil Rule 56.1, *see* Dkt. 74 ("Def. 56.1"), Dkt. 83 ("Pl. 56.1"), and Dkt. 82 ("Pl. 56.1 Response"); the declaration of Phillip S. Frank in support of defendants' motion, Dkt. 75 ("Frank Decl."), and attached exhibits; the declaration of David Zelman in support of Palacios's motion, Dkt. 80 ("Zelman Decl."), and attached exhibits.  Some exhibits are attached to both parties' declarations; citations to a jointly cited exhibit that use only one citation are for convenience.  When the Court cites to the defendants' Rule 56.1 statement, it does so for facts that are undisputed or substantively undisputed by Palacios.

On July 13, 2011, however, the summons was dismissed and the warrant was vacated.  *Id.*

¶¶ 4–5.  Nevertheless, the warrant remained reported as active in the ADW database.  *See id.*

¶ 16; Frank Decl. Ex. K ("Greaney Decl.") ¶ 7; Greaney Dep. at 30–36.

### 2.   2012:  M.P.'s Identification of Palacios as Her Assailant

A year later, on July 13, 2012, a complaining witness, "M.P.," reported to the NYPD that

someone had punched her in the face and attempted to steal the chain necklace she was wearing

around her neck as she entered her apartment building in the Bronx.  JSF ¶ 7.  Later that day,

defendant Detective Chevere interviewed M.P. inside the 40th Precinct.  *Id.* ¶ 8.  During the

interview with Chevere, M.P. told Chevere that her attacker was roughly 5'8" to 6' tall.  M.P.

Dep. at 81.[3]  Chevere entered a height range of 5'8" to 6' tall into the NYPD PhotoManager

system.  JSF ¶ 10.

Chevere's search yielded an array of mugshot photographs, including a mugshot

photograph of Palacios.  *Id.* ¶ 12.  During the interview, M.P. "alerted Detective Chevere to a

mugshot photograph of [Palacios]."  *Id.* ¶ 13.  M.P. testified that she "could identify [her

attacker] in one of the pictures and I told [the police officers with her in the precinct] that it was

him."  M.P. Dep. at 44.  She further testified that the officer "asked me if I was sure that that was

him [her attacker] and I told them yes."  *Id.* at 46.[4]  Chevere testified that, based upon M.P.'s

---

[3] Palacios claims the factual record is in conflict about what M.P. told Chevere about her
attacker's height.  It is not.  M.P. testified she told the police that her attacker was 5'8" to 6' tall.
M.P. Dep. at 81–82.  The portions of M.P's deposition Palacios cites are not to the contrary.
M.P. testified there that her attacker was six feet tall, but, crucially, she did not testify that is
what she told the police.  *Id.* at 27.  She also answered "yes" to a question about whether she
calculated her attacker's height as "approximately" six feet tall, *id.* at 65–66.  This
approximation is consistent with telling Chevere her attacker's height was 5'8" to 6'.

[4] Contrary to Palacios's claims, the evidence is not in conflict on this point, either.  Palacios
notes that when M.P., in her deposition, was shown a printout of the photo array she had viewed
in the 40th Precinct, she testified that her attacker and the person (Palacios) in the photograph

identification of Palacios as her attacker based in turn on the photograph she viewed in the array, he considered there to be probable cause to arrest Palacios for the robbery of M.P.  Chevere Dep. at 64.  Chevere did not tell M.P. Palacios's height, which is 5'6".  *Id.* at 64–66; JSF ¶ 11.

### 3.    May 22, 2014:  Palacios's Arrest and Detention

The record sheds little light on the efforts, if any, the NYPD made to locate Palacios in the two years after M.P. identified him as her attacker.[5]  On May 20, 2014, Greaney testified, he was then working in an NYPD warrant squad, with responsibility for making arrests, when his supervisors gave him information about Palacios and the attack on M.P.  Greaney Dep. at 8–10.  That day, at approximately 2:30 p.m., Greaney searched Palacios's name on the ADW.  JSF ¶¶ 14–15.  The search was one of a number of computer checks that Greaney did on Palacios that afternoon.  *Id.*  The ADW search revealed an active warrant for Palacios's arrest.  *Id.* ¶ 16; *see also* Greaney Dep. at 30–36 (testifying that a search of the ADW database revealed "the subject did have an active warrant" and that in the ADW entry "a picture of the warrant came up").

---

she then selected "look alike," M.P. Dep. at 47–48.  Palacios argues that M.P.'s use of this locution in her deposition calls into question whether M.P. had been confident nearly four and a half years earlier in her identification of him as her attacker to the police.  That is wrong.  M.P.'s deposition testimony was that, at the time of the identification at the precinct, she was able to and did unqualifiedly identify the picture (of Palacios) she selected from the photo array as depicting her attacker.  She testified that she told Chevere that she was able to identify her attacker and that she was sure that the person in the picture she selected (Palacios) was her attacker.  *Id.* 44–46.  She did not testify that she had then been at all uncertain of that identification or that she expressed any uncertainty.  Her statement in her December 13, 2016 deposition that the photograph and her attacker "look alike" speaks instead to her lessened confidence, years after the attack, in making the same identification.

[5] Chevere, who interviewed M.P. the day of the attack, testified generally that "there were efforts made to locate" Palacios, but that he could not recall what or when these were.  Chevere Dep. at 59–60.  Chevere testified that he believes Palacios was not located for nearly two years after the attack because he "was no longer at the address that [the NYPD] had on file."  *Id.* at 61.  Monge similarly testified that the NYPD tried, unsuccessfully, to locate Palacios before May 20, 2014.  Monge Dep. at 77.

Greaney's searches also indicated Palacios's address, which the officers used to begin to locate him.  Greaney Dep. at 11.

On May 22, 2014, at approximately 7:10 a.m., Greaney, along with two other officers not sued in this case, arrested Palacios at his workplace, 30 Waterside Plaza in Manhattan.  *Id.* ¶ 17. Greaney and the other officers transported Palacios to the 40th Precinct.  He arrived at about 9:53 a.m.  *Id.* ¶ 18.

Once Palacios was inside the precinct, other officers took custody of him from Greaney. JSF ¶ 19.  Monge testified that his supervisor, a Sergeant Lopuzzo, assigned him to be the "arresting officer" for the arrest of Palacios after he had been brought to the precinct.  Monge Dep. at 9–10.  Monge then spoke to the detective originally assigned to the case, Chevere.  *Id.* at 11.  To complete the processing of Palacios's arrest for the attack on M.P., Monge testified that he needed to contact the complainant (M.P.), so he tried to call her.  *Id.* at 12–13.  Monge was unable to reach her; Chevere also attempted to contact M.P. to ask her to come to the precinct to view a line up.  *Id.* at 84–86.  Palacios remained in custody during these efforts.  *See* JSF ¶¶ 19–22.

Once M.P. was reached, Monge testified, she told Chevere that she did not believe she would be able to identify her attacker and did not desire to cooperate in the case.  Monge Dep. at 84–85.  This testimony accords with an affidavit prepared that evening by the Bronx District Attorney's Office in support of "Declining/Deferring Prosecution" of Palacios.  The affidavit states that Chevere reached M.P. at roughly 1:15 p.m. on May 22, 2014, and that M.P. told him, "It's been a long time, and I probably won't be able to identify the guy.  I don't want to waste the

time." JSF ¶ 20; *see also* Frank Decl., Ex. M.[6]  At some point after this conversation, the Bronx

District Attorney's Office faxed Detective Monge the affidavit, which stated that the Bronx

District Attorney would not prosecute Palacios for the robbery charge.  JSF ¶ 21.

At approximately 7 p.m. the same evening, after learning that the Bronx District

Attorney's Office had declined to prosecute Palacios, Palacios was transported from the 40th

Precinct to Bronx Central Booking, where he arrived at approximately 7:51 p.m.  JSF ¶ 22.

Monge explained that he sent Palacios to Bronx Central Booking because he had learned that

Palacios had an open arrest warrant on the ADW system—arising from the 2011 incident—

which required Palacios to be put before a judge.  Monge Dep. at 31–32, 35–36.  Monge testified

that he does not recall whether it was he or some other officer that performed the warrant check

on the ADW system that revealed the open warrant.  *Id.* at 30–32.  Forensic evidence—in the

form of an sworn affidavit from a detective, John Sabino, who in January 2017 did an "audit

inquiry" of the ADW—indicates that it was Monge who did the warrant check.  *See* Frank Decl.,

Ex. C ("Sabino Aff.").  Sabino's audit revealed that Monge "viewed the warrant on May 22,

2014 around [12:52 p.m.]."  *Id.* ¶ 6; *see also* Sabino Aff. at 4 (print-out of log of all views of

Palacios's warrant indicates that "Frank Monge" executed the activity of "warrant printed" on

May 22, 2014 at 12:52 p.m.).[7]  Palacios spent the night at Bronx Central Booking.  *See* JSF

¶¶ 22–24.

---

[6] The affidavit adds that the "[a]rresting officer also contacted the complainant at 1:00pm and
4:00pm and could not reach the complainant, receiving voicemail."  Frank Decl., Ex. M.

[7] Palacios claims it is unclear whether Monge knew of Palacios's arrest warrant.  The record is to
the contrary.  Monge testified that he recalled learning that Palacios had a warrant, Monge Dep.
at 30–32, and the ADW audit—whose results are uncontradicted—confirms that on May 22,
2014, he accessed the database that revealed this, Sabino Aff. at 4.  Monge's memory was
unclear only as to whether he personally conducted the search for the warrant in the ADW

### 4.      May 23, 2014:  The Warrant Checks at Bronx Central Booking

The next morning, May 23, 2014, at approximately 8:37 a.m., Police Administrative Aide Theresa Andrades-Harper at Bronx Central Booking conducted a warrant check on Palacios.  *See id.* ¶ 23; Andrades-Harper Dep. at 23.  Andrades-Harper testified in her deposition that she determined the warrant was valid.  Andrades-Harper Dep. at 23.  Shortly thereafter, Andrades-Harper's supervisor, Sergeant Letty Doiley, conducted a separate search to determine whether other arrest warrants were outstanding for Palacios; Doiley's search uncovered no other warrants.  *See* Doiley Dep. at 28–29, 31–32.[8]

### 5.      The Night of May 23, 2014:  Palacios's Release

---

system.  Monge Dep. at 31.  In addition, the print-out log indicates that "Michael Greaney" executed the activity of "warrant printed" on May 20, 2014 at 2:43 p.m.  Sabino Aff. at 4.

[8] Palacios relies on a notation in the NYPD Online Prisoner Arraignment Form which states, regarding the database checks done in the morning of May 23, 2014, "[W]arrant check done by PAA Harper: Deft has a warrant, Dkt# 2011SX047660[.]  NYSID and name check done by Sgt. Doiley: Neg results[.]"  Frank Decl., Ex. O, at D7.  Palacios interprets the end of that notation to mean that the warrant check yielded no open arrest warrant for him, such that defendants "knew or should have known the 2011 dismissed summons had been vacated by May 23 at 8:47 a.m. at the latest."  Palacios Br. at 18.  But the key words used on this form—"Neg. results"—cannot be so construed on Palacios's say-so, without testimony from a knowledgeable witness so decoding them.  And here, of the pertinent witnesses, Andrades-Harper testified that her search that morning revealed an open arrest warrant for Palacios, Andrades-Harper Dep. at 23.  And the "Neg results" notation is otherwise explained:  Shortly after Andrades-Harper's search, her supervisor, Doiley, conducted a separate "NYSID name check" search in the database, to determine whether Palacios had any "additional arrest numbers."  Doiley testified that her "Neg. results" notation referred to the results of that check, which revealed that Palacios did not have any "additional arrest numbers"; it did not, Doiley testified, mean that there was not an open warrant for Palacios arising from the 2011 incident.  *See* Doiley Dep. at 28–29, 31–32.  Palacios separately relies on the opinion expressed by Sabino in his deposition, to the effect that he would have understood the "Neg. results" notation to indicate the 2011 arrest warrant had been vacated.  Sabino Dep. at 46–47.  However, Sabino, unlike Doiley, was not a percipient witness to the notation.

Palacios was released from custody that night, May 23, 2014, at roughly 11:45 p.m.  In total, he had been detained approximately 40 hours and 35 minutes.  JSF ¶¶ 24–25.  Palacios's release came approximately 28 hours after the Bronx District Attorney's Office communicated its decision not to prosecute him for the 2014 robbery of M.P., and approximately 15 hours after Harper and Doiley conducted their warrant checks.  *See id.* ¶¶ 22, 24–26.

Defendants contend that it was at about this time that they learned that the 2011 warrant had been vacated.  Def. 56.1 ¶ 54.  There is no contrary competent evidence as to the time when defendants learned the warrant had been vacated.[9]  The timing of this discovery is consistent with the OLPA form, which reflects a search at 11:51 p.m. with the result "warrant [sic] was vacated."  Frank Decl. Ex. O, at D7.

### B.    Procedural History

On January 20, 2015, Palacios filed the original complaint in this case.  Dkt. 1.  In it, Palacios brought federal and state law claims of false arrest, failure to intervene in response to a violation of constitutional rights, excessive pre-arraignment detention, denial of medical treatment, and illegal investigatory detention under 42 U.S.C. § 1983, and state claims of false arrest, pre-arraignment delay, and illegal investigatory detention under New York law.  Palacios named the City, Greaney, Monge, and John and Jane Doe(s) as defendants.  On June 10, 2015, the City of New York filed an answer.  Dkt. 5.  On September 15, 2015, Greaney and Monge filed an answer.  Dkt. 6.

---

[9] As noted, *see supra* note 8, Palacios interprets Doiley's "Neg. results" notation to reflect an earlier determination by the NYPD that the 2011 warrant had been vacated, but the record—and in particular, the testimony of Doiley, who was responsible for that notation—does not support that claim.

On August 14, 2016, after receiving leave to do so, Dkt. 33, Palacios filed the operative

complaint, the AC.  The AC brought the same claims as before but added Chevere as a

defendant. Dkt. 34.  On August 29, 2016, Greaney, Monge, and the City answered.[10]  Dkt. 36.

On January 3, 2017, after the close of discovery, the Court set a schedule for summary

judgment briefing.  The Court also dismissed all municipal liability claims brought against the

City under 42 U.S.C. § 1983, along with count 7 of the AC, which alleged, under § 1983, the

denial of medical treatment while in custody.  *See* Dkt. 69.

On February 8, 2017, defendants filed a motion for summary judgment, Dkt. 73, along

with a memorandum in support, Dkt. 76.  On March 24, 2017, Palacios cross-moved for

summary judgment.  Dkt. 79.  The same day, Palacios filed a brief in support of his motion and

in opposition to defendants'.  Dkt. 81 ("Palacios Br.").  On April 20, 2017, defendants filed a

reply.  Dkt. 88.  On April 30, 2017, Palacios filed a reply.  Dkt. 89.

## II.    Applicable Legal Standards

To prevail on a motion for summary judgment, the movant must "show[] that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a

question of material fact.  In making this determination, the Court must view all facts "in the

light most favorable" to the non-moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

---

[10] On November 2, 2016, Palacios filed an affidavit of service, attesting that, on November 1, 2016, Chevere was served with process. Dkt. 52.  Chevere has not since filed an answer to the AC.  Palacios did not, however, file a motion for default judgment against Chevere.  Chevere, with Greaney and Monge, moves for summary judgment in his favor and opposes Palacios's motion for summary judgment.  Dkt. 73.

To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," because "conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal citation omitted). Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby Inc*., 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

## III. Discussion

Palacios's main claims, both under § 1983 and state law, are for false arrest and excessive pre-arraignment detention, *see* AC ¶¶ 21–35, 52–68. He also brings a federal claim for failure to intervene in the violation of his rights, *id.* ¶¶ 36–46, federal and state-law claims for illegal investigatory detention, *id.* ¶¶ 80–95,[11] and a state-law claim against the City for *respondeat superior* liability for defendants' actions, *id.* ¶¶ 47–51.

---

[11] In his memorandum of law, Palacios states that he has voluntarily dismissed his claims "sounding in denial of medical treatment and illegal investigatory detention." Dkt. 81 at 1. In fact, the Court had not previously dismissed the illegal investigatory detention claims. The Court construes Palacios's statement as a motion to withdraw those claims, and hereby dismisses them.

In moving for summary judgment as to all of Palacios's federal claims, defendants argue that their arrest of Palacios was protected because there was probable cause to arrest Palacios, and because the evidence does not establish, as a matter of law, Palacios's claims of excessive pre-arraignment delay.  Defendants also argue that they are entitled to qualified immunity, and that they were not personally involved Palacios's detention at Bronx Central Booking.  For his part, Palacios moves for summary judgment, asserting that there was not probable cause to arrest him and that the defendants undisputedly learned that the 2011 warrant purportedly justifying his detention was invalid during in the morning of on May 23, 2014, yet held him for more than 12 additional hours.  The Court addresses these arguments in turn.

### A.      False Arrest

#### 1.      Legal Standards Governing Claims for False Arrest

Because there was probable cause to arrest Palacios, based either on M.P.'s positive photographic identification of Palacios as her assailant or on the ADW system's report (albeit inaccurate) of an open arrest warrant for Palacios dating to 2011, the individual defendants are entitled to summary judgment on Palacios's false arrest claims.

Section 1983 provides redress for a deprivation of federally protected rights by persons acting under color of state law.  42 U.S.C. § 1983.  To prevail on a § 1983 claim, a plaintiff must establish (1) the violation of a right, privilege, or immunity secured by the Constitution or laws of the United States (2) by a person acting under color of state law.  *West v. Atkins*, 487 U.S. 42, 48 (1988); *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155–56 (1978).

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law."  *Weykant v. Okst*, 101 F.3d 845, 852

(2d Cir. 1996), *cert. denied*, 528 U.S. 946 (1999) (internal citations omitted); *accord Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007).  Under New York law, a plaintiff bringing a claim for false arrest must show that "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged."  *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (quoting *Broughton v. State of New York*, 335 N.E.2d 310, 314 (N.Y. 1975)) (internal quotation marks omitted).

A confinement is privileged when the arresting officer had probable cause to arrest.  *See Jocks v. Tavernier*, 316 F.3d 128, 135 (2d Cir. 2003); *Jenkins*, 478 F.3d at 84 ("The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983.") (internal quotation marks and citation omitted).  Probable cause exists "when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested."  *Lacey v. Daly*, 26 F. App'x 66, 67 (2d Cir. 2001) (summary order) (quoting *Singer*, 63 F.3d at 119) (internal quotation marks omitted).  Whether probable cause existed is a commonsense inquiry.  It is to be based on the totality of the circumstances and not on reflexive, isolated, or technical criteria. *See, e.g.*, *Illinois v. Gates*, 462 U.S. 213, 232 (1983); *United States v. Falso*, 544 F.3d 110, 117 (2d Cir. 2008); *United States v. Delossantos*, 536 F.3d 155, 159 (2d Cir. 2008).

The lawfulness of an arrest does not depend on an ultimate finding of guilt or innocence. *Pierson v. Ray*, 386 U.S. 547, 555 (1967); *Wiltshire v. Wanderman*, No. 13 Civ. 9169 (CS), 2015 WL 4164808, at *3 (S.D.N.Y. July 10, 2015) (that charges were later dropped is "irrelevant" to whether probable cause existed at the time of arrest).  Rather, "[w]hen determining whether

probable cause exist[ed] courts must consider those facts *available to the officer* at the time of arrest." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (internal quotation marks and citation omitted) (emphasis in *Panetta*); *accord Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("Whether probable cause exists depends on the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.").

Further, "probable cause does not require an awareness of a particular crime, but only that some crime may have been committed." *Ackerson v. City of White Plains*, 702 F.3d 15, 20 (2d Cir. 2012) (internal quotation marks and citation omitted).  As such, "it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006).  "[A]n arrest is not unlawful so long as the officer ha[d] . . . probable cause to believe that the person arrested [] committed *any crime*." *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007) (emphasis added).  So long as an arrest is supported by probable cause, a person may be arrested for a violation of any offense, no matter how minor, so long as that offense is a crime.  *See, e.g.*, *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.").

In a lawsuit claiming false arrest, "[t]he burden of establishing the absence of probable cause rests on the plaintiff." *Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 524 (S.D.N.Y. 2015) (internal quotation marks omitted).  The Court may determine, as a matter of law, whether probable cause existed when there is no dispute as to the pertinent events or the knowledge of the arresting officers.  *Weyant*, 101 F.3d at 852.

### 2.      Qualified Immunity Standards for Claims for False Arrest

Even if there was not probable cause to arrest the plaintiff, an officer will be entitled to qualified immunity if "arguable probable cause" existed, meaning, whether "a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in light of well established law." *Cerrone v. Brown*, 246 F.3d 194, 202–03 (2d Cir. 2001) (internal quotation marks omitted) (citation omitted).  The doctrine of qualified immunity provides a complete defense when "either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991); *accord Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 416 (2d Cir. 1999).  Its purpose is to "give[] government officials breathing room to make reasonable but mistaken judgments" and to protect "all but the plainly incompetent or those who knowingly violate the law."  *City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)) (internal quotation marks omitted).

### 3.      Analysis of Palacios's False Arrest Claims

Defendants argue that, for two reasons, they had probable cause, or at least arguable probable cause supporting a finding of qualified immunity, to arrest Palacios:  (1) the complaining witness, M.P., had identified Palacios as the person who had attacked her in 2012, and (2) there was an indication of an open warrant for Palacios's arrest for the 2011 offense in the NYPD's warrant database, on which defendants reasonably relied.  Defendants are correct.  Each ground entitles defendants to summary judgment on Palacios's claim of false arrest.

As to the attack on and attempted robbery of M.P.:  The officers had probable cause—and it was certainly reasonable for the officers to believe that they had probable cause—to arrest Palacios for those crimes based on M.P.'s positive identification of Palacios as her assailant.  The day of the attack, Chevere interviewed M.P. at the 40th Precinct.  JSF ¶¶ 7–8.  M.P testified that she told Chevere that her attacker was 5'8" to 6' tall, M.P. Dep. at 81; Chevere entered those parameters into the NYPD photo database, JSF ¶ 10.  As M.P. testified, after being shown photographs responsive to those parameters, she told Chevere that she "could identify [her attacker] in one of the pictures and told [the police officers there with her in the precinct] that it was him," meaning Palacios, M.P. Dep. at 44.  M.P. further testified that Chevere "asked me if I was sure that that was him [her attacker] and I told them yes," *id.* at 46.  M.P. was then asked to, and did, circle the picture of her assailant and sign her name underneath it.  *See* Frank Decl., Ex. J.  Consistent with this, the NYPD "Complaint – Follow Up" record prepared by Chevere states that, on July 13, 2012, the attack victim had viewed mugshot pictures in NYPD's PhotoManager system with the "criteria used for the search . . . based on the description given to me by the [victim]," and that the victim "did identify . . . Alex Palacios . . . as the perp who attempted to steal her chain."  Frank Decl., Ex. I.  Chevere testified that he regarded M.P.'s positive identification of the photograph of Palacios as the person who attacked her to constitute probable cause to arrest Palacios for that robbery.  Chevere Dep. at 64.

That assessment is correct:  M.P.'s positive identification, made shortly after the attack, gave the police probable cause to believe that Palacios attacked M.P.  "When information is received from a putative victim or an eyewitness, probable cause exists, unless the circumstances raise doubt as to the person's veracity."  *Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001); *see also Lebowitz v. City of New York*, 606 F. App'x 17, 18 (2d Cir. 2015) (summary

order) (same).  Chevere did not have any reason to doubt M.P.'s truthfulness in identifying

Palacios.  Notably, M.P. did not express any hesitation as to her capacity to identify her attacker.

On the contrary, in her deposition, she testified that she was able to identify her attacker and had

told Chevere, when he pursued the point, that she was sure the person in the photograph

(Palacios) was her attacker.  M.P. Dep. at 44, 46.  And M.P. circled and twice signed her name

under photographs of Palacios, eliminating any real possibility of miscommunication between

her and the officers as to which photograph she had selected.  Frank Decl., Ex. J.  This

identification gave the officers probable cause to believe that Palacios had been M.P.'s assailant.

It follows that the instruction to Greaney, nearly two years later, to find and arrest Palacios was

lawful.  The passage of time did not erode the reliability of the earlier victim identification on

which that arrest was sought.

As to the ADW system's record reflecting an extant arrest warrant dating to 2011:  It

gave Greaney, upon discovering that record before setting out to arrest Palacios, *see* Greaney

Dep. at 30–36, an independent lawful basis to arrest Palacios.  It was objectively reasonable for

Greaney to treat that record as reflecting the existence of a lawful arrest warrant for Palacios.

That the warrant—unknown to Greaney and unrecorded in the database—had been voided did

not make it unreasonable to rely on the database's record of it.  *See, e.g.*, *United States v. Santa*,

180 F.3d 20, 27 (2d Cir. 1999) (officers' reliance on a typically reliable warrant tracking system

was objectively reasonable); *United States v. Miller*, 265 F. App'x 5, 7 (2d Cir. 2008) (summary

order) ("When an officer learns from a computer database . . . that a person is the subject of an

outstanding arrest warrant, probable cause exists to arrest that person.") (citing *Santa*, 180 F.3d

at 27).  Greaney's lawful bases for arresting Palacios, in turn, protects his colleagues in the arrest

process, including defendants Chevere and Monge, from liability for false arrest.  *See United*

*States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001) (arrest is permissible when "the actual arresting . . . officer lacks the specific information to form the basis for probable cause . . . but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation"); *see also* Greaney Dep. at 45–47 (testifying that Greaney's database check revealed a warrant for Palacios and that Greaney gave that information and whatever other information he had about the case to the detective working on the case, pursuant to his normal practice).  As a matter of law, based on these undisputed facts, defendants are entitled to summary judgment for Palacios's federal and state-law claims of false arrest.

Palacios's arguments to the contrary—and in support of his own bid for summary judgment in his favor on these claims—are unavailing.  He argues that Chevere should have affirmatively told M.P. that Palacios was 5'6", and that the fact that Palacios was two inches below the height range given by M.P. makes her identification of the photograph of Palacios too unreliable to support probable cause.  But that slight discrepancy, given M.P.'s firmly positive identification of Palacios, does little to undermine the reliability of her identification as a basis for finding probable cause.  Height estimates given by an assault victim are approximations, and Palacios's actual height was only two inches outside the range given by M.P. to the police.  Numerous factors may affect a victim's ability to precisely gauge an assailant's height, including the duration and nature of the interactions between the victim and the assailant, the victim's height relative to the perpetrator, and the perpetrator's footwear.[12]  M.P.'s sure identification of Palacios was sufficient to supply probable cause that he was the assailant.

---

[12] M.P. is 5 feet tall, Zelman Decl., Ex. M, at 3.

Palacios separately argues that probable cause was undermined by M.P.'s statement as to the assailant's height when interviewed nearly four years later (February 6, 2016) by a private investigator hired by Palacios's counsel.  M.P. then stated that her attacker had been about 5'8" to 5'9".  Zelman Decl., Ex. M. at 4.  Far from undermining probable cause, that statement was in accord with M.P.'s contemporaneous account in 2012 of the assailant's height, and described heights just two to three inches apart from Palacios.  In any event, even if it were dissonant from her 2012 account, M.P.'s recollection of her assailant's height two years after the attack would not bear on the probable cause determination, which turns on the reliability of the information known to the officers at the time of the arrest.

Finally, even if the discrepancies between M.P.'s account of her assailant's height and Palacios's actual height were enough to defeat probable cause—and they are not—the ADW system's report of a live warrant for Palacios's arrest based on the 2011 incident would independently have justified that arrest as lawful.

Because the defendants had probable cause and reasonably believed they had probable cause to arrest Palacios, all defendants are entitled to prevail on Palacios's false arrest claims under federal and state law.  The Court therefore grants summary judgment to the defendants on the false arrest claims, and denies Palacios's motion for summary judgment on those claims.

**B.      Excessive Pre-Arraignment Detention**

The parties also cross move for summary judgment on Palacios's federal and state claims of excessive pre-arraignment detention.  The Court grants summary judgment in favor of defendants on both claims.

As to Palacios's state-law claim, he appears to plead a cause of action under New York Criminal Procedure Law § 140.20, in that he cites that provision in arguing for summary

judgment on this claim, *see* Palacios Br. at 17–20, though the AC does not cite that provision, *see* AC ¶¶ 65–68.  In setting forth the procedure to be used by police officers when arresting persons without a warrant, New York Criminal Procedure Law § 140.20 generally directs police officers, "after performing without unnecessary delay all . . . preliminary police duties," to bring the arrested person before a local criminal court to be arraigned "without unnecessary delay." N.Y. Crim. Proc. Law. § 140.20(1).  New York cases interpreting this provision, typically in the context of *habeas corpus* proceedings pursuing the petitioner's release, have recognized that the pre-arraignment steps can generally be completed within 24 hours after arrest, so as to make longer arraignments presumptively unreasonable under § 140.20.  *See People ex rel. Maxian on Behalf of Roundtree v. Brown*, 164 A.D.2d 56, 64–68 (N.Y. App. Div. 1st Dep't 1990), *affirmed* 570 N.E.2d 223, 225 (N.Y. 1991) ("The Appellate Division concluded that the steps leading up to arraignment can generally be accomplished well within 24 hours after arrest and that the delays" in these cases "were 'unnecessary' within the meaning of CPL 140.20(1).  We find no reason on this record to disturb this conclusion.").  Dispositive here, however, as the Second Circuit has recognized, § 140.20 does not create a private right of action allowing the subject of an excessive pre-arraignment detention to pursue a later damages action.  *See Watson v. City of New York*, 92 F.3d 31, 36–37 (2d Cir. 1996) (Section 140.20 does not create a private right of action, as it "would be largely superfluous because . . . the common law tort of false imprisonment includes a right to recover for undue delay in arraignment" and concluding that "the district court erred in allowing the jury to award [plaintiff] damages pursuant to a private right of action implied from section 140.20(1)"); *see also Ortiz v. City of New York*, No. 11 Civ. 7919 (JMF), 2013 WL 5339156, at *3 (S.D.N.Y. Sept. 24, 2013) (same).  As such, the Court

grants summary judgment to defendants on Palacios's claim for excessive pre-arraignment detention brought under state law.[13]

As to Palacios's federal-law claim, the individual defendants move on two grounds. First, they argue, they are entitled to summary judgment because Palacios was released within 48 hours, a period the Supreme Court held presumptively constitutionally reasonable in *County of Riverside v. McLaughlin*, 500 U.S. 44, 56–57 (1991). *County of Riverside* requires that, when the probable cause determination is made within 48 hours after a plaintiff's arrest, then, for a detention to violate the plaintiff's Fourth Amendment rights as excessively long so as to give rise to an action for damages, the burden rests with the plaintiff to prove that the probable cause determination was delayed unreasonably, with the officers allowed a substantial degree of flexibility taking into account the practical realities of pretrial procedures. *See* 500 U.S. at 54–58. Second, defendants argue for summary judgment on the ground that they were not personally involved in Palacios's detention. Palacios, in turn, pursues summary judgment in his favor, claiming factually that Sergeant Doiley's records search on the morning of May 23, 2014 established that the 2011 warrant had been vacated. On this factual premise, Palacios argues that

---

[13] Although Palacios does not mention the New York State Constitution, to the extent he might have sought to base his state-law claim for excessive pre-arraignment detention on it, it, too, would not support such a claim, because "there is no private right of action under the New York State Constitution for claims that are remediable under Section 1983 or other state laws." *Maldonado v. City of New York*, No. 11 Civ. 3514 (RA), 2014 WL 787814, at  *12 (S.D.N.Y. Feb. 26, 2014) (quoting *Batista v. City of New York*, No. 05 Civ. 8444 (KMK), 2007 WL 2822211, at *9 (S.D.N.Y. Sept. 25, 2007)).  Here, Palacios's excessive pre-arraignment delay claim brought under state law mirrors the claim brought under § 1983, *see* AC ¶¶ 52–68 & at 14–15 ("Injury and Damages"), under which such a claim—provided the facts support it—is remediable.

there was no justification for detaining him during the ensuing 15 hours, and that this detention therefore violated his constitutional rights.[14]

For two independent reasons, the Court holds with defendants on this claim.

First, there is no competent evidence on which a finder of fact could find that Palacios was detained after the officers had determined that the 2011 arrest warrant had been vacated and thus were on notice such that the record reflecting an active warrant was inaccurate. Palacios's sole basis for so claiming is that Doiley's records search the morning of May 23, 2014 ostensibly established, 15 hours before his release, that there was no active warrant for his arrest. But there is no competent evidence supporting that claim. The officers' testimony on that point, including Doiley's, is to the contrary. And there are no conventional business records reflecting that the 2011 warrant was revealed by Doiley's search as having been vacated. The only aspect of that search on which Palacios relies is Doiley's notation, "Neg. Result." Doiley explains that notation as referring to a different aspect of her search—the "name search," to which her notes expressly refer. The "name search" examined whether *other* arrest warrants for Palacios were

---

[14] Palacios also claims that defendants were not entitled to rely on the ADW system's listing of Palacios's warrant as active when they sent him to Bronx Central Booking. Therefore, Palacios argues, his detention was unlawful from the point at which the Bronx District Attorney's Office conveyed its decision not to prosecute Palacios for the attack on M.S. But the record reveals no basis for concluding that the ADW system was sufficiently unreliable to make it objectively unreasonable to rely on its report of an open warrant. Greaney testified that, although there is a possibility of "computer error" in the NYPD and court databases and that the various databases "do not one hundred percent of the time coincide" as "sometimes there is a delay between the court system and the NYPD," Greaney Dep. at 43–44, these imperfections do not make the ADW as a whole unreliable. And Palacios did not muster any evidence systemically calling the ADW into question. The mere possibility of errors in a warrant database alone does not make that database unreliable. *See Santa*, 180 F.3d at 27 (officers objectively reasonable in relying on a historically accurate warrant database even though warrant at issue, which was listed as outstanding in the database, had actually been vacated). Notably, Greaney testified that when he searched for Palacios's warrant in the ADW database, "a picture of the warrant came up." Greaney Dep. at 36.

outstanding and found that they were not.  To be sure, a jury would be free not to credit Doiley's explanatory testimony as to her notes, and on defendants' summary judgment motion, the Court therefore sets this testimony aside.  But the two-word notation "Neg Result" itself—which on its face is not self-explanatory and which could equally refer to the "name search" as to an inquiry into the continuing validity of the 2011 arrest warrant—is question-begging.  Without more, it is too elliptical to supply a sufficient basis on which to base, other than by speculation, a factual finding that Doiley at that point had discovered that the 2011 arrest warrant had been voided. *See supra,* note 8.  On the undisputed facts, far from being held excessively long, Palacios was released promptly upon that discovery.

In any event, even if Doiley's notation did supply sufficient evidence on which a finder of fact could find that she had known the morning of May 23, 2014 that there was no valid warrant supporting Palacios's continued detention, she is not a defendant here.  The three defendants in this case, Greaney, Chevere, and Monge, would still be entitled to summary judgment on the claims of unlawful detention, based on a lack of evidence of personal involvement in the allegedly illegal detention.

Liability under § 1983 requires that a defendant sued in his or her individual capacity be personally involved in the violation of the federal right; a defendant's supervisory authority is insufficient in itself to create liability under § 1983.  *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2001).  "To proximately cause a . . . due process violation . . . a defendant must be personally involved in the violation.  A plaintiff may establish such personal involvement by making any one of five showings (the '*Colon* factors')."  *Warren v. Pataki*, 823 F.3d 125, 136 (2d Cir. 2016) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).

These factors are as follows: that "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [the plaintiffs] by failing to act on information that unconstitutional acts were occurring." *Id.* (quoting *Colon*, 58 F.3d at 873); *see also Patterson v. Cty. of Oneida*, 375 F.3d 206, 229 (2d Cir. 2004) ("[A] plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his [or her] individual capacity under § 1983.  Personal involvement . . . includes not only direct participation in the alleged violation but also gross negligence in the supervision of subordinates who committed the wrongful acts and failure to take action upon receiving information that constitutional violations were occurring.") (citations omitted)).

Critically important here, as to the "direct participation" factor, it requires "personal participation by one who has knowledge of the facts that rendered the conduct illegal." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (citation omitted); *see also Terebesi v. Torreso*, 764 F.3d 217, 234 (2d Cir. 2014) ("[A] 'direct participant' includes a person who authorizes, orders, or helps others to do the unlawful acts, even if he or she does not commit the acts personally.") (citing *Provost*, 262 F.3d at 155).  And gross negligence "denotes a higher degree of culpability than mere negligence.  It is the kind of conduct where the defendant has reason to know of facts creating a high degree of risk of . . . harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk." *Raspardo v. Carlone*, 770 F.3d

97, 116 (2d Cir. 2014).  "A plaintiff pursuing a theory of gross negligence must prove that a supervisor's neglect caused his subordinate to violate the plaintiff's rights in order to succeed on her claim."  *Id.* at 117.

These requirements for liability under § 1983 foreclose Palacios's claims against Greaney, Chevere, and Monge for his excessive detention.  As to Greaney, an officer in the warrant squad, his involvement ended after he, with two other non-party officers, arrested Palacios at the direction of his supervisors based on the attack on M.P. and after having conducted a warrant search in the ADW database.  Greaney thereafter transferred custody of Palacios at the 40th Precinct to officers from the 40th Precinct Detective Squad.  JSF ¶¶ 17–19; *see also* Monge Dep. at 63–65 (testifying that Greaney, whom Monge remembered, after being refreshed, as "the Bronx warrant guy," picked Palacios up from his workplace and brought him to the office).  He had no involvement in the investigation into Palacios thereafter.  And there is no factual basis for imputing to Greaney knowledge of Doiley's ostensible discovery that the 2011 warrant had been voided.  Under the standards set in *Colon*, even if the final 15 hours of Palacios's detention were unlawful, Greaney therefore cannot be held liable for this violation.

As to Chevere, he contacted M.P. after Greaney brought Palacios to the 40th Precinct.  *See* JSF ¶ 20.  Chevere reached her—she indicated she did not want to cooperate further with the investigation and doubted that she would be able to identify Palacios as her attacker in 2012.  *See id.*  The Bronx District Attorney's Office later determined not to prosecute Palacios for the attack on M.P. based upon this information.  Palacios was thereafter held based on the record of a live warrant from 2011.  There is no other evidence in the record that Chevere—after taking these steps with respect to the attack on M.P., including communicating with the Bronx District Attorney's Office—was involved, in any way, in Palacios's detention.  And there is no basis for

attributing to Chevere Doiley's ostensible discovery that the 2011 warrant had been vacated either.

Finally, as to Monge, he was designated as Palacios's arresting officer for internal NYPD purposes. Monge was undisputedly aware (although he could not recall if he actually performed the search in the ADW system) that a warrant existed in the ADW database for Palacios's arrest based on the 2011 incident. Monge Dep. at 30–32; *see also* Sabino Aff. ¶ 6. However, once Monge received confirmation from the Bronx District Attorney's Office that it was declining to prosecute Palacios for the attack on M.P., Monge determined that Palacios should be sent to Bronx Central Booking on account of the 2011 warrant for his arrest, for which Palacios would need to be brought before a judge. Monge Dep. at 35–36. Monge testified that he did not know thereafter what happened to Palacios after Palacios was sent to Bronx Central Booking, and that he detained Palacios in his office in the precinct only until he brought Palacios downstairs the night of May 22, 2014 to be transported by other officers to Bronx Central Booking. *Id.* at 67–69. The detention of Palacios to this point was reasonable. It was based initially on the evidence supplying probable cause that he was the attacker of M.P. and thereafter on the basis of the ADW record indicating an open warrant from 2011.

Monge's involvement in Palacios's detention—like those of Greaney and Chevere—ended at that point. Acting in reliance on the record reflecting an outstanding warrant, Monge sent Palacios to Bronx Central Booking, where Palacios remained until the following evening. Monge therefore was not responsible for the later decisions of whether to hold Palacios or when to release him. And there is no evidentiary basis to attribute to him the results of Doiley's records search the following morning, May 23, 2014, either. As such, Monge cannot be held personally responsible for any illegal detention. Under no view of the facts was he aware of the

critical pillar of such a claim: that the 2011 warrant had been voided and that therefore there was no valid basis to continue to detain Palacios.

Accordingly, the Court grants defendants' motion for summary judgment on Palacios's claim under § 1983 and under state law for excessive pre-arraignment detention, and denies Palacios's motion for summary judgment on these claims.[15]

### C.    *Respondeat Superior*

Palacios's one remaining claim is against the City for *respondeat superior* liability under state law for defendants' conduct committed within the scope of their employment with the City, *see* AC ¶¶ 47–51.  A municipal employer may be liable for the intentional torts and negligence committed by an employee within the scope of his or her employment.  *See Velez v. City of New York*, 730 F.3d 128, 136–37 (2d Cir. 2013); *Biswas v. City of New York*, 973 F. Supp. 2d 504, 539–40 (S.D.N.Y. 2013).  There is no dispute that the named defendants in this case were acting at all times within the scope of their employment with the City, but insofar as these defendants are entitled to entry of summary judgment on all of Palacios's claims, *respondeat superior* liability against the City based on the defendants' conduct cannot lie.  And Palacios does not

---

[15] The parties' briefs all but ignore Palacios's claim under § 1983 for a failure to intervene in the violation of his rights.  *See* AC ¶¶ 36–46.  But, given the rejection of Palacios's claims that his rights were violated, there is no foundation for claiming a failure to intervene in such violation. Although an officer who fails to intervene, having had a realistic opportunity to do so, is liable for the preventable harm caused by other officers' actions when the defendant officer "observes or has reason to know . . . that any constitutional violation has been committed by a law enforcement official," *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (citation omitted), that principle obviously does not apply when "the Court determines that the officer's conduct did not violate a constitutional right," *Williams v. City of New York*, No. 14 Civ. 7158 (JPO), 2016 WL 3194369, at *6 (S.D.N.Y. June 7, 2016) (quoting *Feinberg v. City of New York*, No. 99 Civ. 12127 (RC), 2004 WL 1824373, at *4 (S.D.N.Y. Aug. 13, 2004)).  The Court therefore grants summary judgment to defendants on Palacios's failure to intervene claim.

pursue or substantiate *respondeat superior* liability based on any other City employee's conduct. The Court there dismisses his *respondeat superior* claims.

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motion for summary judgment for all claims brought under federal and state law, and denies Palacios's motion for summary judgment.

The Clerk of Court is respectfully directed to terminate the motions pending at Dkts. 73 and 79, and to close this case.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: September 11, 2017
    New York, New York